IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| WANDA MIMMS, Derivatively On Behalf Of The AIG Incentive Savings Plan, | Civil Action: |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT** |
| PRICEWATERHOUSECOOPERS, LLP, ROBERT H. BENMOSCHE, LAURETTE T. KOELLNER, DONALD H. LAYTON, CHRISTOPHER S. LYNCH, ARTHUR C. MARTINEZ, GEORGE L. MILES, JR., HENRY S. MILLER, ROBERT S. MILLER, SUZANNE NORA JOHNSON, MORRIS W. OFFIT, RONALD A. RITTENMEYER, and DOUGLAS M. STEENLAND, | **JURY DEMANDED** |
| Defendants, | |
| -and- | |
| THE AIG INCENTIVE SAVINGS PLAN, | |
| Nominal Defendants. | |

Plaintiff Wanda Mimms ("Plaintiff"), derivatively on behalf of the AIG Incentive Savings Plan (the "Plan") alleges as follows:

## INTRODUCTION

1.     Plaintiff brings this action derivatively on behalf of the Plan against AIG International Group Inc.'s ("AIG" or the "Company") auditor PricewaterhouseCoopers, LLP ("PwC"), for PwC's negligence in conducting the audits of AIG during the Relevant Period (defined below).  Plaintiff also brings this action on behalf of the Plan for the breach of fiduciary duties by the Plan's Board of Directors, for failing to preserve and maintain the assets of the Plan by failing to initiate an action on behalf of the Plan to recover losses caused by PwC's negligently conducted audits of AIG.

2.     From February 29, 2008 through and including January 22, 2009 (the "Relevant Period"), the Plan acquired and held shares of AIG common stock ("AIG Stock" or "Company Stock"), which was offered as one of the retirement saving options in the participant contribution component of the Plan.

3.     At all times relevant hereto, PwC served as the auditor for AIG and knew, or should have known, that: (a) AIG's audited financial statements were materially inaccurate; (b) AIG's Stock price was artificially inflated due to materially inaccurate financial statements and, if the truth had been known, would trade well below the price at which it was then-trading; (c) AIG's audited financial statements, as filed with the United States Securities and Exchange Commission (the "SEC"), were incorporated into the Company's Form S-8; and (d) therefore, it was reasonably foreseeable that AIG's materially inaccurate audited financial statements would be relied upon by the Plan participants and beneficiaries.

4.     As a result of PwC's negligence in conducting its audits of AIG, the Plan suffered substantial losses, resulting in the depletion of millions of dollars from the retirement savings and anticipated retirement income of the Plan's participants.

5.     On July 19, 2010, Plaintiff made a demand on the AIG Investment Committee to take action against PwC to recover losses to the Plan caused by PwC's negligently conducted audits of AIG. *See* Exhibit A attached hereto. This July 19, 2010 was referred to AIG's Board of Directors (the "Board") – the Plan fiduciaries.

6.     On September 13, 2010, Plaintiff's counsel received a letter from Trucker Huss (counsel for the Board) refusing Plaintiff's demand. *See* Exhibit B attached hereto.

7.     To date, the AIG Board has failed to take any action against PwC in connection with PwC's audits of AIG and the resulting harm to the Plan. The Board's failure to act

constitutes a breach of the fiduciary duties they owe to the Plan to maintain and preserve the Plan assets by enforcing the Plan's valid claims.

8.   Plaintiff, therefore, brings this action derivatively, on behalf of the Plan, against PwC for its negligence in conducting its audits of AIG during the Relevant Period. Plaintiff also brings this action against the Board (the Plan fiduciaries), pursuant to Section 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), for breach of the fiduciary duties the Board owes to the Plan.

9.   Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendant PwC's possession, certain of Plaintiff's allegations are by necessity based upon information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support Plaintiff's claim.

## JURISDICTION AND VENUE

10.   *Subject Matter Jurisdiction.* This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l), as well as 28 U.S.C. § 1331. In addition, this Court has supplemental jurisdiction over the state law negligence claim pursuant to 28 U.S.C. § 1367.

11.   *Personal Jurisdiction.* Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because Defendants would be subject to the jurisdiction of a court of general jurisdiction in this District.

12.     *Venue.*  Venue is proper in this District because PwC is headquartered at 1177 Avenue of the Americas, New York, NY 10036, and the Board does business and maintains offices in this District at 180 Maiden Lane, New York, NY 10038.

## PARTIES

### A.   Plaintiff

13.     *Plaintiff Wanda Mimms* ("Mimms") is a former AIG employee and is, and at all relevant times was, a participant in the Plan.

### B.   Defendant PwC

14.     Defendant PwC served as AIG's independent auditor during the Relevant Period. PwC audited AIG's fiscal 2007 financial statements, falsely certified that those financial statements were prepared in accordance with the generally accepted accounting principles ("GAAP"), and falsely represented that it conducted its audits or reviews in accordance with the generally accepted auditing standards ("GAAS").  PwC also reviewed AIG's interim financial statements during the Relevant Period and falsely represented that no material modifications needed to be made for them to conform with GAAP.

### B.   Defendant Board of Directors

15.     Defendant Robert H. Benmosche ("Benmosche") is the President, Chief Executive Officer and Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a).  As such, Defendant Benmosche was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

16.     Defendant Laurette T. Koellner ("Koellner") is a Director of the Company and a

fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Koellner was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

17.    Defendant Donald H. Layton ("Layton") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Layton was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

18.    Defendant Christopher S. Lynch ("Lynch") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Lynch was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

19.    Defendant Arthur C. Martinez ("Martinez") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Martinez was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

20.    Defendant George L. Miles, Jr. ("Miles") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Miles was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets,

including the duty to enforce valid claims held by the Plan.

21.    Defendant Henry S. Miller ("H. Miller") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant H. Miller was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

22.    Defendant Robert S. Miller ("R. Miller") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant R. Miller was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

23.    Defendant Suzanne Nora Johnson ("Johnson") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Johnson was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

24.    Defendant Morris W. Offit ("Offit") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Offit was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

25.    Defendant Ronald A. Rittenmeyer ("Rittenmeyer") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the

Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Rittenmeyer was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

26. Defendant Douglas M. Steenland ("Steenland") is a Director of the Company and a fiduciary of the Plan with the exclusive authority and discretion to manage and control the Plan's assets. ERISA § 403(a), 29 U.S.C. § 1103(a). As such, Defendant Steenland was a fiduciary of the Plan whose duties included, *inter alia*, the duty to preserve and maintain all Plan assets, including the duty to enforce valid claims held by the Plan.

27. Defendants Benmosche, Koellner, Layton, Lynch, Martinez, Miles, H. Miller, R. Miller, Johnson, Offit, Rittenmeyer, and Steenland are herein referred to as the "Board Defendants."

28. The Board Defendants have all powers necessary to administer the Plan, including the power to construe and interpret the Plan documents. 2008 AIG Plan Document, Ex. A, § 12.2(a) (AIG ERISA 0000054).

29. The Board Defendants refused Plaintiff's July 19, 2010 demand letter to prosecute, on behalf of the Plan, the malpractice and/or negligence claims against PwC.

30. The Board Defendants are the named fiduciaries of the Plan. *See* Exhibit B.

**D.   Nominal Defendant**

31. The Plan is an employee pension benefit plan, as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan is a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). Pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.

32.     The Company Stock Fund is one of the investment options available for the Plan participants.  The Plan's Form 5500 for year ended December 31, 2007 reported that the Plan had approximately $271,457,424 in AIG securities.  Further, the Plan's 5500 for year ended December 31, 2008 reported that the Plan had approximately $11,406,692 in AIG securities.

## FACTUAL BASIS OF DEFENDANT PwC's NEGLIGENCE

33.     AIG, through AIG Financial Products Corp. and AIG Trading Group Inc. and their respective subsidiaries (collectively, "AIGFP"), engaged in various credit default swap agreements.  A credit default swap is an instrument which transfers the credit risk of a fixed income investment product.   It is affected through a bilateral contract in which two counterparties agree to isolate and separately trade the credit risk of at least one third-party entity.  The buyer of a credit swap receives credit protection and the seller guarantees the credit worthiness of the third-party entity's product.  In this regard, a credit default swap is similar to an insurance policy.  It is treated as a derivative because its price and value derives from the credit worthiness of the obligations of the third party entity.

34.     In certain cases, the credit risk associated with a designated investment portfolio (i.e., a portfolio of collateralized debt obligations) is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies.  Typically, there will be a layer covering the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and an AAA-rated layer.

35.     According to AIG, in transactions that were rated, the risk layer or tranche that was immediately junior to the threshold level above which AIGFP's payment obligation would generally arise was rated AAA by the rating agencies.  In transactions that were not rated,

AIGFP purportedly applied the same risk criteria for setting the threshold level for its payment obligations. Therefore, the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions was referred to by AIGFP as the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that was rated AAA by the credit rating agencies or if the transaction was not rated, equivalent thereto.

36.     Pursuant to the terms of its super senior credit derivative agreements, AIGFP guaranteed the credit worthiness of the underlying investment (such as collateralized debt obligations, or CDO's), thereby transferring the risk of default from the investor to AIGFP through credit default swaps ("CDS's"). Certain of the CDS's written by AIGFP contained collateral posting requirements whereby the amount of the collateral was to be determined based on the value of the security or loan referenced in the documentation for the credit default swap.

37.     From March through December 2005, AIG (through AIGFP) wrote approximately 220 CDS's on CDO's backed by securities that included mortgage bonds. The CDO's were comprised of a large quantity of securities, each of which was backed by pools of loans (including mortgage loans, auto loans, finance loans, and credit card debt). These CDS's resulted in AIG insuring approximately $80 billion of CDO's, a material portion of which were backed by subprime mortgages. Because a credit default swap is, in essence, a form of guarantee, many of the CDS contracts contained provisions establishing conditions that required AIG to post collateral to evidence its ability to perform under the contract.

38.     The obligation to post collateral was triggered by either a credit rating downgrade of AIG, a credit rating downgrade of the underlying CDO's, or a decline in the value of the underlying CDO's. A severe downturn in the U.S. residential housing market was certain to cause a decline in the underlying value of the CDO's, thus triggering AIG's obligation to post

billions of dollars of collateral.

39.     During 2005, AIG also significantly increased its exposure to real estate related debt through its investments in residential mortgage-backed securities and similar securities.

40.     During 2007, as the U.S. real estate market experienced a severe downturn, AIG claimed that its CDS portfolio was well-insulated against the risk of loss because a catastrophic level of defaults had to take place before it was required to pay the counterparties it was insuring. However, unbeknownst to the investment community, including Plan participants, during the summer of 2007, after a targeted review of AIGFP, the Office of Thrift Supervision ("OTS") instructed AIG to revisit its modeling assumptions in light of deteriorating sub-prime market conditions.  In issuing these instructions, the OTS questioned AIG's valuation of subprime-backed CDS.

41.     In October 2007, the OTS required AIG's Board to undertake a number of remediation efforts regarding identified material control weaknesses and deficiencies.  PwC was informed of this action through procedures performed in connection with its review of AIG's third quarter financial statements (AU 722).

42.     Additionally, on October 1, 2007, Joseph St. Denis ("St. Denis"), a former AIGFP vice president of accounting policy resigned claiming that (i) the valuation model of at least one of AIG's CDS counterparties was at variance with AIG's own model; (ii) he was being intentionally excluded from the CDS valuation process; and (iii) he was told by Joseph J. Cassano (an officer at AIG Financial Products from the division's founding in 1987 until his resignation in February 2008) that "I have deliberately excluded you from the valuation of the Super Seniors [CDS] because I was concerned that you would pollute the process."

43.     After his resignation, St. Denis was interviewed by the PwC engagement partner,

who learned the facts specified in the paragraph above. The PwC engagement partner was also told by St. Denis that, in early September 2007, he learned that AIGFP had received a multi-billion dollar margin call on certain of its Super Senior Credit Default Swaps. St. Denis' comments were taken seriously because St. Denis quit his job citing accounting related improprieties, and because St. Denis had previously served as an Assistant Chief Accountant in the Division of Enforcement of the SEC.

44.    On November 7, 2007, AIG filed its Form 10-Q for the quarterly period ended September 30, 2007 with the SEC. This fiduciary communication stated the following regarding AIGFP's super senior credit derivatives:

> The ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since September 30, 2007 is approximately $550 million as of October 31, 2007. [AIG 2007 Third Quarter Form 10-Q, p. 30].

> \*      \*      \*

> The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market. These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes. Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values. [AIG 2007 Third Quarter Form 10-Q, p. 70]

> \*      \*      \*

> As of October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with respect to the fair value of certain AIGFP super senior credit default swaps and the collateral required in connection with such instruments differ significantly from AIGFP's estimates. [AIG 2007 Third Quarter Form 10-Q, p. 70].

45.    The foregoing three excerpts evidence the fact that:

(a)    AIG's valuation of the super senior credit derivatives was increasingly based on "management estimates and judgments", purportedly because there was a "limitation on the availability of market observable information."

(b)    Downgrades by rating agencies adversely affected AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP.

(c)    As of October 31, 2007, certain of AIG's counterparties to the super senior credit default swaps had arrived at "significantly" different valuations for the underlying investment and the collateral required in connection with such instruments.

46.    In other words, as of October 31, 2007, there were disputes between AIG and its counterparties over the values of investments which were the subject of various super senior credit default swaps and, therefore, there were disputes over collateral call requirements.

47.    After a 2007 third quarter disclosure of collateral calls from counterparties (without disclosing the identity of the counterparties or the amounts demanded), AIG downplayed the disputes while concomitantly concealing its exposure to a CDS-triggered liquidity crisis.  For example, Cassano stated: "we have been husbanding our liquidity all through this trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in."  Additionally, during a December 5, 2007 investor meeting, Cassano described the collateral calls from counterparties as frivolous "drive by[s]."

48.    The foregoing statements were made at a time when AIG's controls over the valuation of the CDS portfolio "were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates on a timely basis."  As subsequently revealed,

minutes of AIG's audit committee memorialized the fact that there was a "lack of timely elevation of key data to the AIG level" and AIG "designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Accounting function."

49.     Indeed, on November 29, 2007 (as later memorialized in minutes of AIG's January 15, 2008 Audit Committee meeting), PwC advised AIG of the existence of deficiencies in its risk management of the CDS portfolio, noting that these deficiencies could rise to the level of a "material weakness." As stated in the January 15, 2008 Audit Committee minutes:

> Mr. Ryan [of PwC] reported that in light of AIG's plans to hold the investor conference on December 5, PwC had raised their concerns with Mr. Sullivan and Mr. Bensinger on November 29, informing them that PwC believed that AIG could have a material weakness relating to the risk management of these areas.
>
> *       *       *
>
> Mr. Ryan expressed PwC's concern that this weakness may have resulted in a material disclosure error and that it could result in an income statement and/or disclosure error in the future if it was not addressed. Mr. Ryan said that PwC believes that Management's oversight of AIG Investments is insufficient, due to lack of access and unclear delineation of roles and responsibilities, and performance management and transparency are not where they should be.

50.     These Audit Committee minutes further stated that PwC reported that: management and PwC had agreed to gather more information, and that numerous meetings and much analysis had taken place among PwC and management, including Messrs. Martin J. Sullivan (former President and Chief Executive Officer of American International Group, Inc.), Steven J. Bensinger (Chief Financial Officer and Executive Vice President of AIG from March 2005 to May 8, 2008), Robert Lewis (former Senior Vice President and Chief Risk Officer), Michael E. Roemer (AIG's Director of Internal Audit and Senior Vice President), and Elias F. Habayeb (Chief Financial Officer of AIG's financial services group).

51.     Minutes of AIG's February 7, 2008 Audit Committee meeting memorialized the

fact that the AIGFP valuation process was "insular" and that the controls "did not operate effectively."

52.     On February 11, 2008, AIG filed a Form 8-K with the SEC which purported to "expand its prior disclosures relating to the methodology and data inputs used to determine the fair values of the super senior credit default swap portfolio."   This fiduciary communication admitted that AIG was unable to reliably value its super senior credit default swaps as follows:

> As disclosed in AIG's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 (the "Form 10-Q"), AIGFP values its super senior credit default swaps using internal methodologies that utilize available market observable information and incorporate management estimates and judgments when information is not available. In doing so, it employs a modified Binomial Expansion Technique ("BET") model that currently utilizes, among other data inputs, market prices obtained from independent sources, from which it derives credit spreads for the securities constituting the collateral pools underlying the related CDOs.  The modified BET model derives default probabilities and expected losses from market prices, not credit ratings.  The initial implementation of the BET model did not adequately quantify, and thus did not give effect to, the benefit of certain structural mitigants, such as triggers that accelerate amortization of the more senior CDO tranches.

> As disclosed in the Form 10-Q, AIG did not give effect to these structural mitigants ("cash flow diversion features") in determining the fair value of AIGFP's super senior credit default swap portfolio for the three months ended September 30, 2007.  Similarly, these features were not taken into account in the estimate of the decline in fair value of the super senior credit default swap portfolio through October 31, 2007 that was also included in the Form 10-Q because AIG was not able to reliably estimate the value of these features at that time.  Subsequent to the filing of the Form 10-Q, through development and use of a second implementation of the BET model using Monte Carlo simulation, AIGFP was able to reliably estimate the value of these features.  Therefore, AIG gave effect to the benefit of these features in determining the cumulative decline in the fair value of AIGFP's super senior credit default swap portfolio for the period from September 30, 2007 to November 30, 2007 that was disclosed in AIG's Current Report on Form 8-K/A, dated December 5, 2007 (the "Form 8-K/A") filed after AIG's December 5, 2007 Investor Conference.

> In addition, during AIG's December 5 Investor Conference, representatives of AIGFP indicated that the estimate of the decline in fair value of AIGFP's super senior credit default swap portfolio during November was then being determined on the basis of cash bond prices for securities in the underlying collateral pools, with

> valuation adjustments made not only for the cash flow diversion features referred to above but also for "negative basis", to reflect the amount attributable to the difference (the "spread differential") between spreads implied from cash CDO prices and credit spreads implied from the pricing of credit default swaps on the CDOs.

53.    As later memorialized in minutes of AIG's March 11, 2008 Audit Committee meeting, PwC also reported:

> a new material weakness in control over the super senior valuation process and oversight thereof and a new significant deficiency in control over access, roles and responsibilities of critical control functions . . . that the new material weakness resulted from the large errors in connection with the models used by AIGFP, the lack of timely elevation of key data on the negative basis and collateral issues to the AIG level, and the fact that AIGFP had designed a valuation process that did not allow the involvement of Enterprise Risk Management and the AIG Finance function in developing the approach.

54.    On February 28, 2008, PwC issued its report on AIG's consolidated financial statements as of and for the fiscal year ended December 31, 2007. This report, which was prominently displayed in AIG's 2007 Form 10-K (a fiduciary communication) stated:

To the Board of Directors and Shareholders of American International Group, Inc.:

> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of American International Group, Inc. and its subsidiaries (AIG) at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to

above is described in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2007 consolidated financial statements, and our opinion regarding the effectiveness of AIG's internal control over financial reporting does not affect our opinion on those consolidated financial statements. AIG's management is responsible for these financial statements and financial statement schedules, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in management's report referred to above. Our responsibility is to express opinions on these financial statements, on the financial statement schedules, and on AIG's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Note 1 to the consolidated financial statements, as of January 1, 2007, AIG changed the manner in which it accounts for internal replacements of certain insurance and investment contracts, uncertainty in income taxes, and changes or projected changes in the timing of cash flows relating to income taxes generated by leveraged lease transactions.

As described in Notes 1 and 17 to the consolidated financial statements, AIG changed its accounting for certain hybrid financial instruments, life settlement contracts and share based compensation as of January 1, 2006, and certain employee benefit plans as of December 31, 2006.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately

and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

55.     PwC was negligent in issuing this report because PwC negligently failed to conduct its audit in conformity with generally accepted auditing standards ("GAAS"). Among other things, GAAS (AU 341) states:

The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited (hereinafter referred to as a reasonable period of time). The auditor's evaluation is based on his knowledge of relevant conditions and events that exist at or have occurred prior to the completion of fieldwork. Information about such conditions or events is obtained from the application of auditing procedures planned and performed to achieve audit objectives that are related to management's assertions embodied in the financial statements being audited, as described in section 326, Evidential Matter.

56.     PwC either negligently failed to evaluate whether there was substantial doubt about AIG's ability to continue as a going concern for a reasonable period of time beyond the date of the financial statements being audited, or was negligent in the performance of this evaluation. In either case, PwC negligently failed to append a "going concern" paragraph which would have served to put the investing public, and Plan participants, on notice that AIG was facing a severe liquidity crisis that threatened the survival of the Company. In this regard, PwC failed to recognize that:

(a)     AIG had insured tens of billions of dollars of real estate related debt

pursuant to arrangements that required AIG to post tens of billions of collateral in the event of a severe downturn in the U.S. real estate market.

(b)     The U.S. real estate market was experiencing a severe downturn and counterparties were demanding that AIG post billions of dollars of collateral.

(c)     AIG had no reserves established for the posting of collateral, and no borrowing capability sufficient to cover the billions of dollars of likely near term collateral calls.

(d)     AIG's statement in its 2007 form 10-K that "[m]anagement believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, including the funding of increased dividends under AIG's new dividend policy" was unsupportable.

(e)     AIG's woefully deficient internal controls and unreliable accounting methodologies were intentionally permitted to exist at AIG in order to obscure AIG's precarious liquidity position.

(f)     Given the facts and circumstance that existed as of the February 28, 2008 date of PwC's report, AIG was unlikely to be able to continue as a going concern throughout 2008.

57.     During its negligent audit of AIG's financial statements as of and for the year ending December 31, 2007, PwC made judgements that no other auditor would have made under the circumstances and arrived at a conclusion that was not supported by the facts.

58.     PwC negligently issued February 28, 2008 report, insofar as it stated that PwC's audit of the Company's financial statements were conducted in accordance with GAAS, was materially inaccurate because the following GAAS (AU 150) were negligently violated:

(a)    General Standard No. 1 was violated, which standard requires that the examination is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

(b)    General Standard No. 3 was violated, which standard requires that due professional care is to be exercised in the performance of the examination and in the preparation of the report.

(c)    Standard Of Field Work No. 1 was violated, which standard requires that the work is to be adequately planned and assistants, if any, are to be properly supervised.

(d)    Standard Of Field Work No. 2 was violated, which standard requires that a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

(e)    Standard Of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

(f)    Standard Of Reporting No. 1 was violated, which standard requires that the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

(g)    Standard Of Reporting No. 3 was violated, which standard requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

59.    The Company was required to disclose in its 2007 Form 10-K the existence of a going concern uncertainty. The Company failed to make such disclosures and PwC was,

therefore, required pursuant to GAAS to inform the investing public of this fact by issuance of an appropriately modified report.

60.    PwC negligently violated GAAS in failing to modify its February 28, 2008 report to include an explanatory "going concern" paragraph explaining the nature and extent of AIG's liquidity issues.

61.    GAAS (AU 316) states that the auditor should exercise (a) due care in planning, performing, and evaluating the results of audit procedures, and (b) the proper degree of professional skepticism to achieve reasonable assurance that material errors or irregularities will be detected.

62.    PwC failed to comply with GAAS in that it negligently failed to perform its examinations with a proper degree of professional skepticism. In this regard, PwC either identified and negligently ignored evidence that AIG was facing a severe liquidity crisis, or negligently failed to identify the liquidity crisis thereby making audit judgments that no reasonable auditor would have made if confronted with the same facts.

63.    PwC violated the provisions of GAAS (AU 311) which provides that the auditor should obtain a level of knowledge of the entity's business that will enable the auditor to plan and perform the audit in accordance with GAAS because that knowledge of the entity's business helps the auditor in:

(a)    Identifying areas that may need special consideration.

(b)    Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization.

(c)    Evaluating the reasonableness of management representations.

(d)    Making judgments about the adequacy of disclosures.

64.     Had PwC undertaken the performance of those audit procedures which were required by GAAS, and with the due professional care which was required by GAAS (AU 230), PwC would have known that, given AIG's CDS contractual obligations and the state of the economy and the real estate environment as of February 28, 2008, there was a serious question whether or not AIG had sufficient liquidity to continue as a going concern through the end of 2008.  In negligent disregard of professional standards, PwC failed to disclose this fact to the investing public (including Plan members) as required by GAAS.

65.     GAAS (AU 150) states that: "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  PwC negligently failed to comply with this GAAS mandate.

66.     On September 17, 2008, the U.S. Government provided $85 billion to AIG to prevent its bankruptcy.

67.     Plan participants sustained inordinate losses due to their reliance upon the negligently issued PwC report specified above.

### THE PLAN INCORPORATES SEC FILINGS

68.     The Company's direct and indirect communications with the Plan's participants included statements regarding investments in AIG Stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan-related documents, which incorporated and/or reiterated these statements. These were expressly incorporated into the Plan, as set forth in the Form S-8 filed by the Company. *See, e.g.,* AIG Registration Statement for the Plan (Form S-8) filed Dec. 18, 2007 (incorporating certain 10-Ks, 10-Qs, Form 8-Ks).

## INJURY TO THE PLAN

69.     As a consequence of PwC's negligently conducted audits, as specified in paragraphs 33 to 67 above, the Plan suffered substantial losses, resulting in the depletion of millions of dollars from the retirement savings and anticipated retirement income of the Plan's participants.

70.     PwC knew that the AIG SEC filings containing the audited financial statements were incorporated by reference and, therefore, would be, and were, relied upon by the Plan participants because from 2007 through 2008, PwC also provided audit services to the Plan.  As the auditor of the Plan, PwC knew that AIG's periodic SEC filings containing audited financial statements were incorporated by reference into the Plan and, therefore, relied upon by the Plan participants.  Accordingly, PwC knew that AIG's audited financial statements, which were included in AIG's publicly filed documents during the Relevant Period, would be, and were, relied upon by the Plan participants.

## BREACH OF FIDUCIARY DUTIES ALLEGATIONS

71.     Plaintiff brings this action against Board Directors under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  Section 502(a)(2), 29 U.S.C. § 1132(a)(2), states that "[a] civil action may be brought -- " "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"  ERISA Section 409(a), 29 U.S.C. § 1109(a), states that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary,* and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

72.     As noted above, the Board owes the Plan the fiduciary duty to preserve and maintain all the Plan assets, including the duty to enforce valid claims held by the Plan.

73.     Despite its fiduciary duty to do so, the Board failed to undertake any action to recover losses to the Plan caused by PwC's negligence in performing its audits of AIG during the Relevant Period.

74.     On July 19, 2010, Plaintiff made a demand on the Board to initiate an action against PwC.  *See* Exhibit A attached hereto.  On September 13, 2010, the Board responded, respectively (attached hereto as Exhibit B); however, the Board has not taken action as of the date of the filing of this Complaint.

75.     Defendant Director's failure to take any action against AIG for more than five months after Plaintiff's demand, constitutes a breach of the fiduciary duties it owes to preserve and maintain all the Plan assets.

## FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY TO PRESERVE AND MAINTAIN PLAN ASSETS
#### (Claim Against the Board Directors)

76.     Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

77.     The Board Directors owe the Plan, their participants and beneficiaries the fiduciary duty to preserve and maintain the Plan assets.  This duty includes enforcing valid claims held by the Plan.

78.     Despite the fact that Plaintiff issued a demand upon the Board Directors to take action to pursue claims on behalf of the Plan against PwC based on PwC's negligent audits of AIG during the Relevant Period, the Board Directors have failed to do so.

- 23 -

79.     The Board Directors failure to take any action whatsoever to enforce the Plan's valid claim against PwC for professional malpractice in connection with PwC's audits of AIG during the Relevant Period, constitutes a breach of the fiduciary duties that the Board Directors owes to the Plan.   As a consequence of this breach, the Plan suffered losses.

80.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

## SECOND CAUSE OF ACTION

### PROFESSIONAL MALPRACTICE

**(Trust Beneficiaries' Derivative Claim under New York Law on Behalf of the Plan Against Defendant PwC)**

81.     Plaintiff incorporates by reference paragraphs 33 through 75 of this Complaint as if fully set forth herein.

82.     Plaintiff, as a participant in the Plan, is a beneficiary of a trust under New York law who may derivatively seek relief on behalf of the Plan against PwC because the Board Directors have refused to act upon Plaintiff's demand that the Board Directors seek such relief on behalf of the Plan.

83.     Plaintiff made a written demand upon the Board Directors to take action against PwC for the losses to the Plan caused by PwC's negligent audits of AIG during the Relevant Period, but the Board Directors have taken no action with respect to, and has thereby refused, that demand.

84.     Defendant PwC owed a duty of care to AIG to exercise that degree of skill normally expected of accountants performing auditing services for public companies.   In

performing audits for AIG during the Relevant Period, however, PwC failed to exercise the degree of care, skill, and competence exercised by competent members of the accounting profession as alleged above.

85.     Further, due to the fact that PwC served as auditor of the Plan from 2007 through 2008, it knew that the audited financial statements included in the AIG public filings during the Relevant Period would be incorporated into the Plan and, therefore, would be and were relied upon by participants and beneficiaries of the Plan.

86.     The Plan has suffered actual damages as a result of being funded with AIG Stock.

87.     Defendant PwC is liable for all losses to the Plan as a result of the afore-described violations of its professional duties and negligence.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for:

A.     An Order compelling Defendant PwC to make good to the Plan all losses resulting from Defendant PwC's negligence and professional malpractice in the audits of AIG during the Relevant Period, and to restore to the Plan all profits which the participants would have made if PwC had fulfilled its professional obligations in conducting those audits;

B.     Imposition of a Constructive Trust on any amounts by which Defendant PwC was unjustly enriched at the expense of the Plan as the result of its negligence;

C.     Actual damages in the amount of any losses the Plan suffered as a consequence of the Board Director's breach of fiduciary duties in failing to initiate action against PwC in order to enforce valid claims by the Plan against PwC based upon PwC's negligent audit of AIG during the Relevant Period;

D.     An Order awarding attorney' fees; and

E.      An Order for equitable restitution and other appropriate equitable relief against Defendant PwC.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 4, 2011

RIGRODSKY & LONG, P.A.

By: /s/ _____
        Seth D. Rigrodsky
        Timothy J. MacFall
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Telephone (516) 683-3516
Email: sdr@rigrodskylong.com
Email: tjm@rigrodskylong.com

-and-

Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rigrodskylong.com

*EGLESTON LAW FIRM*
Gregory M. Egleston
360 Furman Street, Suite 443
Brooklyn, NY 11201
Telephone: (646) 227-1700
Facsimile: (646) 227-1701
Email: egleston@gme-law.com
        greg.egleston@gmail.com

*Attorneys for Plaintiff*

## VERIFICATION

I, WANDA MIMMS, hereby verify that I have reviewed the foregoing Verified Complaint and have authorized its filing.  The allegations contained therein as to myself are true and correct, and the other allegations are true and correct to the best of my knowledge, information and belief.

Date: November 23, 2010

_WANDA MIMMS_

# EXHIBIT A

## *Egleston Law Firm*

360 Furman Street
Suite 443
Brooklyn, NY 11201
Email: greg.egleston@gmail.com
Email: egleston@gme-law.com
Website: www.gme-law.com

Tel: (646) 227-1700                                                                                    Fax: (646) 227-1701

July 19, 2010

**Via Overnight FedEx**

Mr. David Junius
American International Group, Inc.
AIG Investment Committee
70 Pine Street
New York, New York 10270

Re:     The American International Group, Inc. Incentive Savings Plan

Dear Mr. Junius:

We are counsel for Wanda Mimms (a former American International Group, Inc. ("AIG" or the "Company") employee and, at all relevant times, a participant in the American International Group, Inc. Incentive Savings Plan (the "Plan"). This letter is being transmitted to you to demand that the AIG Investment Committee (the "Committee") prosecute, on behalf of the Plan, the malpractice and/or negligence claims that are set forth below against PricewaterhouseCoopers ("PwC") and/or direct the Trustee of the Plan or other responsible entity or person to prosecute these claims.

PwC served as the purportedly independent auditor of AIG during the period of February 28, 2008 through the present. PwC's audited AIG's fiscal 2007 financial statements and incorrectly represented that it conducted its audit in accordance with generally accepted auditing standards ("GAAS"). PwC breached its professional duties to the Plan, and/or was negligent in performing its duties, because PwC failed to recognize that: (a) AIG had insured tens of billions of dollars of real estate related debt pursuant to arrangements that required AIG to post tens of billions of collateral in the event of a severe downturn in the U.S. real estate market; (b) the U.S. real estate market was experiencing a severe downturn and counter-parties were demanding that AIG post billions of dollars of collateral; (c) AIG had no reserves established for the posting of collateral, and no borrowing capability sufficient to cover the billions of dollars of likely near term collateral calls; (d) AIG's statement in its 2007 form 10-K that "[m]anagement believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, including the funding of increased dividends under AIG's new dividend policy" was

*Mr. David Junius*
*July 19, 2010*
*Page 2*

unsupportable; (e) AIG's woefully deficient internal controls and unreliable accounting methodologies were permitted to exist at AIG in order to obscure AIG's precarious liquidity position; and (f) given the facts and circumstance that existed as of the February 28, 2008 date of PwC's report, AIG was unlikely to be able to continue as a going concern throughout 2008. As a result of PwC's professional malpractice and/or negligence, the Plan suffered substantial losses.

For the foregoing reasons, we hereby make a formal demand upon the Committee, in its capacity as fiduciary of the Plan, to prosecute professional malpractice and/or negligence claims against PwC to recover the Plan assets. The purpose of this demand letter is to give the Committee the opportunity to institute claims on behalf of Plan. If you fail to respond or contact us within thirty (30) days of the date of this letter, we will assume that you have refused this demand and we, derivatively on behalf of the Plan, will then institute an action to obtain the remedies we are asking you to obtain herein.

We look forward to hearing from the Committee regarding this matter.

Very truly yours,

Gregory M. Egleston

-and -

Thomas J. McKenna
Gainey & McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017

# EXHIBIT B

Lee A. Trucker
R. Bradford Huss
Charles A. Storke
Benjamin F. Spater
Deborah Judith Wiener
Julie Burbank
Ronald J. Triche
Mary E. Powell
Robert F. Schwartz
Tiffany N. Santos
Kevin E. Nolt
Clarissa A. Kang

# TRUCKER ✦ HUSS

A PROFESSIONAL CORPORATION
ERISA AND EMPLOYEE BENEFITS ATTORNEYS

Elizabeth L. Loh
Matthew L. Gouaux
Michelle L. Schuller
Virginia H. Perkins
Jennifer Dack Brooks
J. Marc Fosse
Jennifer B. Chung
Brian C. Gilmore
Robert R. Gower

Of Counsel
Barbara B. Creed

Special Counsel
Barbara P. Pletcher
Richard A. Gilbert

September 13, 2010

***VIA FEDERAL EXPRESS***

Writer's Direct Dial
415 277-8007

Gregory M. Egleston
Egleston Law Firm
360 Furman Street
Suite 443
Brooklyn, New York 11201

Re:   *The American International Group, Inc. Incentive Savings Plan*

Dear Mr. Egleston:

We write on behalf of the AIG Retirement Board (the "Board") in response to your July 19, 2010 letter to Mr. David Junis, a member of the American International Group, Inc. ("AIG") Investment Committee. Your letter was sent on behalf of Wanda Mimms, a participant in the AIG Incentive Savings Plan (the "Plan"). In that letter, you demand that the fiduciaries of the Plan prosecute claims of professional negligence and/or professional malpractice against PricewaterhouseCoopers ("PwC") on behalf of the Plan. You also set out the ways in which you assert that PwC breached its duties and state that the Plan suffered substantial losses as a result of PwC's alleged breaches. As indicated in Richard A. Grosiak's August 11, 2010 letter to you, your demand was referred to the Board, the named fiduciary of the Plan, for consideration at the Board's next regularly scheduled meeting.

The Board held a meeting on August 24, 2010 at which the demand outlined in your July 19, 2010 letter was considered. Prior to that meeting, the Board retained our law firm, Trucker Huss, as independent outside fiduciary counsel to assist in considering the demand. We reviewed your demand and analyzed the factual background and relevant legal principles relating to your assertion that the Plan had professional negligence and/or professional malpractice claims against PwC. I attended the Board meeting and presented our analysis to the Board and answered their questions. I also reviewed with the Board the fiduciary responsibility rules applicable to them under ERISA.

In its deliberations, the Board considered the legal viability of any professional negligence and professional malpractice claims that the Plan might be able to assert against PwC, the Plan's likelihood of success on those claims and the potential costs to the Plan of pursuing those claims in litigation, as the costs of bringing any such claims against PwC would be paid from Plan assets and borne by the Plan participants. The Board reviewed the points described in your letter and the factual background of the matter as well as relevant legal authorities concerning malpractice claims against accountants.

Gregory M. Egleston
September 13, 2010
Page 2

The claims alleged in your letter relate to PwC's audit of AIG's 2007 fiscal year financial statements. The Board carefully considered the strength of any potential professional negligence and professional malpractice claims by the Plan based on PwC's audit of AIG's 2007 financial statements, both as direct claims and as derivative claims. Among other facts, the Board noted that the Plan was not in contractual privity with PwC as to its audit of AIG's 2007 fiscal year financial statements and that there has been no restatement by AIG of its financial statements for the 2007 fiscal year. The Board considered the controlling law and the factual underpinnings necessary to state such claims by the Plan against PwC and assessed that such claims would have little chance of success and could potentially be very expensive for the Plan to litigate.

The Board also took into consideration the fact that PwC is currently a defendant in *In re American International Group, Inc. 2008 Securities Litigation*, S.D.N.Y., Case No. 1:08-cv-04772 (the "Securities Litigation"), a securities action currently pending in federal court. The plaintiffs in that lawsuit allege that PwC violated Section 11 of the Securities Act of 1933, based on allegations of fact similar to those outlined in your letter. The Plan is a member of the putative plaintiff class in the Securities Litigation and should receive part of any recovery if the Securities Litigation against PwC is successful or results in a settlement. The Board determined that a malpractice action against PwC by the Plan in state court attempting to recover losses to the Plan based on the same underlying facts as Securities Litigation would be largely duplicative, as well as unlikely to succeed.

For the reasons described herein and other reasons discussed and considered at the Board's August 24, 2010 meeting, and after careful and thorough deliberation, the Board determined, based on the facts currently known to the Board, that expending Plan assets to bring the claims against PwC alleged in your July 19, 2010 letter would not be in the best interests of the Plan and its participants. Therefore, the Board does not intend to commence litigation against PwC as demanded in your July 19, 2010 letter. Your letter also states that, if the Plan fiduciaries do not prosecute the claims you allege against PwC, you will institute an action against PwC "derivatively on behalf of the Plan." We are unaware of any basis for Ms Mimms, as a Plan participant, to assert state law claims against a third party on behalf of the Plan.

Please direct any further correspondence on this matter to me at the address above.

Very truly yours,

R. Bradford Huss

R. Bradford Huss

RBH:ss

cc:    AIG Retirement Board

#1106891