## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WANDA MIMMS, Derivatively On Behalf Of The AIG Incentive Savings Plan, | **Civil Action: 11 CIV 0030** |
| Plaintiff, | |
| vs. | **AMENDED VERIFIED COMPLAINT** |
| PRICEWATERHOUSECOOPERS, LLP, RICHARD A. GROSIAK, ROBERT THOMAS, KATHLEEN SHANNON, ROBERT COLE, GARY REDDICK, HOWARD GREENE, DAVE FIELDS, THE AIG RETIREMENT BOARD and JOHN and JANE DOES 1 THROUGH 20, | **JURY DEMANDED** |
| Defendants, | |
| -and- | |
| THE AIG INCENTIVE SAVINGS PLAN, | |
| Nominal Defendant. | |



Plaintiff Wanda Mimms ("Plaintiff"), derivatively on behalf of the AIG Incentive Savings Plan (the "Plan") alleges as follows:

### INTRODUCTION

1.      Plaintiff brings this action derivatively on behalf of the Plan against AIG International Group Inc.'s ("AIG" or the "Company") auditor PricewaterhouseCoopers, LLP ("PwC"), for PwC's negligence in conducting the review and audit of AIG's financial statements during the Relevant Period (defined below).  Plaintiff also brings this action on behalf of the Plan for the breach of fiduciary duties by the Plan's AIG Retirement Board (defined below), for failing to preserve and maintain the assets of the Plan by failing to initiate an action on behalf of

the Plan to recover losses caused by PwC's negligently conducted review and audit of AIG's financial statements.

2.      From November 7, 2007 through and including September 16, 2008 (the "Relevant Period"), the Plan acquired and held shares of AIG common stock ("AIG Stock" or "Company Stock"), which was offered as one of the retirement saving options in the participant contribution component of the Plan.

3.      At all times relevant hereto, PwC served as the auditor for AIG and knew, or should have known, that:  (a) AIG's financial statements were materially inaccurate; (b) AIG's Stock price was artificially inflated due to materially inaccurate financial statements and, if the truth had been known, would trade well below the price at which it was then-trading; (c) AIG's financial statements, as filed with the United States Securities and Exchange Commission (the "SEC"), were incorporated into the Company's Form S-8; and (d) therefore, it was reasonably foreseeable that AIG's materially inaccurate financial statements would be relied upon by the Plan participants and beneficiaries.

4.      As a result of PwC's negligence in connection with its 2007 Third Quarter review and its 2007 year end audit of AIG's financial statements, the Plan suffered substantial losses, resulting in the depletion of millions of dollars from the retirement savings and anticipated retirement income of the Plan's participants.

5.      On July 19, 2010, Plaintiff made a demand on the AIG Investment Committee to take action against PwC to recover losses to the Plan caused by PwC's negligently conducted audits of AIG (the "Demand").  *See* Exhibit A attached hereto.  The Demand was referred to AIG's Retirement Board (the "Retirement Board") – the Plan fiduciaries.

6.     On September 13, 2010, Plaintiff's counsel received a letter from Trucker Huss (counsel for the Retirement Board) refusing the Demand. *See* Exhibit B attached hereto.

7.     To date, the Retirement Board has failed to take any action against PwC in connection with PwC's review of AIG's 2007 Third Quarter financial statements and its audit of AIG's 2007 annual financial statements and the resulting harm to the Plan.  The Retirement Board's failure to act constitutes a breach of the fiduciary duties they owe to the Plan to maintain and preserve the Plan assets by enforcing the Plan's valid claims.

8.     Plaintiff, therefore, brings this action derivatively, on behalf of the Plan, against PwC for its negligence in conducting its audits of AIG during the Relevant Period.  Plaintiff also brings this action against the Retirement Board (the Plan fiduciaries), pursuant to Section 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), for breach of the fiduciary duties the Board owes to the Plan.

9.     Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in the possession of PwC and the Retirement Board, certain of Plaintiff's allegations are by necessity based upon information and belief.  At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support Plaintiff's claim.

### JURISDICTION AND VENUE

10.     *Subject Matter Jurisdiction.*  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l), as well as 28 U.S.C. § 1331.  In addition, this Court has supplemental

jurisdiction over the state law negligence claim pursuant to 28 U.S.C. § 1367.

11.     *Personal Jurisdiction*.  Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because Defendants would be subject to the jurisdiction of a court of general jurisdiction in this District.

12.     *Venue*.  Venue is proper in this District because PwC is headquartered at 1177 Avenue of the Americas, New York, NY 10036, and the Board does business and maintains offices in this District at 180 Maiden Lane, New York, NY 10038.

## PARTIES

### A.     Plaintiff

13.     *Plaintiff Wanda Mimms* ("Mimms") is a former AIG employee and is, and at all relevant times was, a participant in the Plan.

### B.     Defendant PwC

14.     *Defendant PwC* served as AIG's independent auditor during the Relevant Period. PwC audited AIG's fiscal 2007 financial statements, falsely certified that those financial statements were prepared in accordance with the generally accepted accounting principles ("GAAP"), and falsely represented that it conducted its audits in accordance with the generally accepted auditing standards ("GAAS").  PwC also reviewed AIG's 2007 Third Quarter interim financial statements.

### C.     The AIG Retirement Board

15.     As explained in more detail *infra*, the Retirement Board has general responsibility for the administration of the Plan.  It is the Plan Administrator and the named fiduciary to the Plan. *See* AIG Retirement Board Resolution (AIG ERISA 000080-A).  At all relevant times, the

members of the Retirement Board include, upon information and belief:

        A.      ***Defendant Richard A. Grosiak*** ("Grosiak") was, at the time the Demand was refused and continues to be, a member of the Retirement Board.  Defendant Grosiak has also served as the Director of Employee Benefits, the designated administrator of the Plan, and a member of the Administrative Board;

        B.      ***Defendant Robert Thomas*** ("Thomas") was, at the time the Demand was refused and continues to be, a member of the Retirement Board;

        C.      ***Defendant Kathleen Shannon*** ("Shannon") was, at the time the Demand was refused and continues to be, a member of the Retirement Board.  Defendant Shannon has also been a Senior Vice President of Corporate Security and Deputy General Counsel at AIG;

        D.      ***Defendant Robert Cole*** ("Cole") was, at the time the Demand was refused and continues to be, a member of the Retirement Board.  Defendant Cole has also been and continues to be a Divisional Actuary at AIG;

        E.      ***Defendant Gary Reddick*** ("Reddick") was, at the time the Demand was refused and continues to be, a member of the AIG Retirement Board.  Defendant Reddick has been with AIG since 1986, serving in various executive offices within the Company;

        F.      ***Defendant Howard Greene*** ("Greene") was, at the time the Demand was refused, and continues to be, a member of the AIG Retirement Board.  Defendant Greene is a Vice President of Global Compensation and Benefits at AIG;

        G.      ***Defendant Dave Fields*** ("Fields") was, at the time the Demand was refused and continues to be, a member of the AIG Retirement Board.  Defendant Fields was also President of Risk Finance at AIG: and

        H.      ***Defendants John and Jane Does 1-10.***  Plaintiff does not currently know

the identity of all the Retirement Board members at the time the Demand was refused. Therefore, some of the members of the Retirement Board are named as Defendants John and Jane Does 1-20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

16.     The Retirement Board and its members (Grosiak, Thomas, Shannon, Cole, Reddick, Greene, Fields, and Defendants John and Jane Does 1-20) are referred to collectively as the "Retirement Board."

17.     In their capacity as members of the Retirement Board, Defendants Grosiak, Thomas, Shannon, Cole, Reddick, Greene, Fields, and Defendants John and Jane Does 1-20 considered the Demand made by Plaintiff to enforce claims against AIG's auditor, PwC, on behalf of the Plan. *See* Exhibit B. At a meeting of the Retirement Board conducted on or about August 24, 2010, the Retirement Board determined not to enforce claims against PwC for malpractice and/or negligence, and improperly refused Plaintiff's demand. *Id.*

18.     In refusing to enforce the claims against PwC for malpractice and/or negligence in connection with PwC's audits of AIG, the Retirement Board breached their fiduciary duties to preserve and maintain the Plan's assets.

**D.     Nominal Defendant**

19.     The Plan is an employee pension benefit plan, as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Specifically, the Plan is a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  Pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.

20.     The Company Stock Fund is one of the investment options available for the Plan

participants. The Plan's Form 5500 for year ended December 31, 2007 reported that the Plan had approximately $271,457,424 in AIG securities. Further, the Plan's 5500 for year ended December 31, 2008 reported that the Plan had approximately $11,406,692 in AIG securities.

## THE PLAN INCORPORATES SEC FILINGS

21.    The Company's direct and indirect communications with the Plan's participants included statements regarding investments in AIG Stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan-related documents, which incorporated and/or reiterated these statements. These were expressly incorporated into the Plan, as set forth in the Form S-8 filed by the Company. *See, e.g.*, AIG Registration Statement for the Plan (Form S-8) filed Dec. 18, 2007 (incorporating certain 10-Ks, 10-Qs, Form 8-Ks).

## FACTUAL BASIS OF DEFENDANT PwC's NEGLIGENCE

22.    AIG is a holding company which, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad. At all relevant times, AIG Financial Products Corp. and AIG Trading Group Inc., and their respective subsidiaries (collectively, "AIGFP"), a key AIG business unit, engaged in various credit default swap ("CDS") agreements. A CDS is an instrument that transfers the credit risk of a fixed income investment product. It is affected through a bilateral contract in which two counterparties agree to isolate and separately trade the credit risk of at least one third-party entity. The buyer of a credit default swap receives credit protection and the seller guarantees the credit worthiness of the third-party entity's product. In this regard, a credit default swap is similar to an insurance policy. It is treated as a derivative because its price and value derives from the credit worthiness of the obligations of the third party entity.

23.     In certain cases, the credit risk associated with a designated investment portfolio (*i.e.*, a portfolio of collateralized debt obligations) is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies.  Typically, there will be a layer covering the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and an AAA-rated layer.

24.     According to AIG, in transactions that were rated, the risk layer or tranche that was immediately junior to the threshold level above which AIGFP's payment obligation would generally arise was rated AAA by the rating agencies.  In transactions that were not rated, AIGFP purportedly applied the same risk criteria for setting the threshold level for its payment obligations.  Therefore, the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions was referred to by AIGFP as the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that was rated AAA by the credit rating agencies or, if the transaction was not rated, equivalent thereto.  *See* AIG Annual Report for the fiscal year ended December 31, 2006, filed with the SEC on Form 10-K at p. 95.

25.     Pursuant to the terms of its super senior credit derivative agreements, AIGFP guaranteed the credit worthiness of the underlying investment (such as collateralized debt obligations, or "CDO's"), thereby transferring the risk of default from the investor to AIGFP through CDS's. Certain of the CDS's written by AIGFP contained collateral posting requirements whereby the amount of the collateral was to be determined based on the value of the security or loan referenced in the documentation for the credit default swap. *See* AIG 2007 Form 10-K at p. 17.

26.     From March through December 2005, AIG wrote approximately 220 CDS's on

CDO's backed by securities that included mortgage bonds. The CDO's were comprised of a large quantity of securities, each of which was backed by pools of loans (including mortgage loans, auto loans, finance loans, and credit card debt). These CDS's resulted in AIG insuring approximately $80 billion of CDO's, a material portion of which were backed by subprime mortgages. Because a CDS is, in essence, a type of guarantee, the majority of the CDS contracts contained provisions establishing conditions that required AIG to post collateral to evidence its ability to perform under the contract.

27.     The obligation to post collateral was triggered by either a credit rating downgrade of AIG, a credit rating downgrade of the underlying CDO's, or a decline in the value of the underlying CDO's.

28.     During 2005, AIG also significantly increased its exposure to real estate related debt through its investments in residential mortgage-backed securities ("RMBS") and similar securities. Accordingly, a severe downturn in the U.S. residential housing market was certain to trigger losses and cause a decline in the underlying value of the CDO's, thus triggering AIG's obligation to post billions of dollars of collateral.

29.     During 2007, as the U.S. real estate market experienced a severe downturn, AIG claimed that its CDS portfolio was well insulated against the risk of loss because a catastrophic level of defaults had to take place before it was required to pay the counterparties it was insuring. However, unbeknownst to the investment community, including Plan participants, during the summer of 2007, after a targeted review of AIGFP, the Office of Thrift Supervision ("OTS") instructed AIG to revisit its valuation modeling assumptions in light of deteriorating sub-prime market conditions, and specifically questioned its valuation of subprime-backed CDS's.

30.     During August 2007, Goldman Sachs made a $1.8 billion collateral call which

AIGFP disputed.  *See* PWC-FCIC 000224-240.[1]

31.    PwC, which served as auditor for *both* AIG and Goldman during this period,
knew that AIG had never marked its positions to market prices and therefore had no basis to
dispute Goldman's figures. Prior to the Goldman margin call, PwC had concluded that
"compensating controls," such as notice from counterparties that collateral was due, made up for
AIG's not having a valuation model. "In other words, one of AIG's risk management tools was
to learn of its own problems from counterparties who did have the ability to mark their own
positions to market prices and then demand collateral from AIG." *See* FCIC Report at p. 269.

32.    In October 2007, the OTS required AIG's Board of Directors to undertake a
number of remediation efforts regarding identified material control weaknesses and deficiencies.
*See* March 5, 2009 testimony of Scott M. Polakoff, Acting Director, Office of Thrift Supervision
before the United States Senate Committee on Banking, Housing and Urban Affairs).  PwC was
informed of this action "in the last quarter of 2007, OTS increased the frequency of meetings
with AIG's risk managers and PwC . . . due to the Agency's progressive concern with corporate
oversight and risk management." *See* March 5, 2009 testimony of Scott M. Polakoff, Acting
Director, Office of Thrift Supervision before the United States Senate Committee on Banking,
Housing and Urban Affairs.

33.    Additionally, on or about October 1, 2007, Joseph W. St. Denis ("St. Denis"), a
former AIGFP vice president of accounting policy resigned claiming that he was being
intentionally excluded from the CDS valuation process and because he was told by Joseph
Cassano (head of AIGFP) that "I have deliberately excluded you from the valuation of the Super

---

[1]      References to "PWC-FCIC _____," are to page numbers of the exhibits to
*Financial Crisis Inquiry Report*, Financial Crisis Inquiry Commission, January 2011 ("FCIC
Report").

Seniors because I was concerned that you would pollute the process." *See* Joseph W. St. Denis October 4, 2008 letter.

34.     After his resignation, St. Denis was interviewed by the PwC audit engagement partner, who learned of the foregoing and the fact that, in early September 2007, St. Denis learned that AIGFP had received a multi-billion dollar margin call on certain of its Super Senior Credit Default Swaps. St. Denis' comments were taken seriously because St. Denis resigned citing accounting related improprieties and because he was an accounting professional who had previously served as an Assistant Chief Accountant in the Division of Enforcement of the SEC.

35.     Also, by October, in consultation with PwC, AIG started to evaluate a pricing model for subprime instruments developed by Moody's. AIG coupled this model with generic CDO tranche data sold by JP Morgan. "Of course, by this time -- and for several preceding months -- there was no active market for many of these tranches" rendering the valuation model woefully inaccurate. "Everyone understood that this was not a perfect solution, but AIG and its auditors thought it could serve as an interim step. The 'makeshift' model was up and running in the third quarter." *See* FCIC Report at p. 270.

36.     PwC even noted in a November 7, 2007 memorandum that, in order to properly apply the model, "spread information on each of the underlying assets is required. However, this would be difficult for the 18-20 thousand individual underlying reference obligations in a normal market environment, and in the current market environment it was not possible to obtain a sufficient coverage and objective set of data for these transactions." *See* PWC-FCIC 000224-240.

37.     As of the end of October, 2007, the market had deteriorated further and additional collateral calls were received by AIG. Goldman Sachs' collateral calls, which had increased to

$3 billion, continued to be disputed by AIG, although AIG had no legitimate basis for doing so. *See* PWC-FCIC 000224-240.

38.     The AIG PwC engagement team consulted with firm specialists including Doug Summa, a PwC Advisory Risk & Regulatory Partner and valuation specialist, as well as other key PwC engagement teams that were believed to have similar or related experience with similar transactions and the types of models being applied. However, the AIG PwC engagement team failed to meet with the Goldman Sachs PwC engagement team (the PwC team that supported Goldman Sachs valuations and collateral calls) to review the detailed support for Goldman Sachs' valuations, and to reconcile the Goldman Sachs' data with the data furnished to them by AIG. Rather than resolving the collateral call dispute by ensuring that its two clients (counter-parties to the same transactions) were consistent in their valuation methodology and thus their application of accounting principles, PwC permitted AIG to stand by the results of its woefully deficient "makeshift" valuation model as a basis to dispute the Goldman Sachs' collateral calls. *See* PWC-FCIC 000224-240.

39.     On November 7, 2007, AIG filed its Form 10-Q for the quarterly period ended September 30, 2007 ("the 2007 Third Quarter 10-Q") with the SEC. This fiduciary communication stated the following regarding AIGFP's super senior credit derivatives:

> The ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since September 30, 2007 is approximately $550 million as of October 31, 2007. *See* AIG 2007 Third Quarter 10-Q at p. 30.

*       *       *

The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market. These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes. Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values. *See* AIG 2007 Third Quarter 10-Q at p. 70.

\* \* \*

As of October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with respect to the fair value of certain AIGFP super senior credit default swaps and the collateral required in connection with such instruments differ significantly from AIGFP's estimates. *See id.*

40.     The foregoing three excerpts evidence the fact that:

(a)     AIG's valuation of the super senior credit derivatives was increasingly based on "management estimates and judgments," purportedly because there was a "limitation on the availability of market observable information";

(b)     Downgrades by rating agencies adversely affected AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP; and

(c)     As of October 31, 2007, certain of AIG's counterparties to the super senior credit default swaps had arrived at "significantly" different valuations for the underlying investment and the collateral required in connection with such instruments.  The obligation to post collateral was triggered by either a credit rating downgrade of AIG, a credit rating downgrade of the underlying CDO's, or a decline in the value of the underlying CDO's.  A severe downturn in the U.S. residential housing market was certain to cause a decline in the underlying value of the CDO's, thus triggering AIG's obligation to post billions of dollars of collateral.

41.    In other words, the 2007 Third Quarter 10-Q disclosed that, as of October 31, 2007, there were disputes between AIG and counterparties over the values of investments which were the subject of various super senior credit default swaps and, therefore, there were disputes over collateral call requirements. The 2007 Third Quarter 10-Q failed to disclose, however, that AIG had no reasonable basis for disputing the counterparties' valuations of the investments that were the subject of various super senior credit default swaps or the appropriateness of the collateral calls. "AIG did not have data to dispute Goldman's marks." *See* FCIC Report at p. 271; PWC FCIC 000111-13.

42.    After a 2007 third quarter disclosure of collateral calls from counterparties (without disclosing the identity of the counterparties or the amounts demanded), AIG downplayed the disputes while concealing (with the help of PwC) its exposure to a CDS-triggered liquidity crisis. For example, Mr. Cassano (head of AIGFP) stated in an email: "we have been husbanding our liquidity all through this trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in." *See* December 30, 2009 Washington Post article: "E-mails reflect growing doubts about AIG." Additionally, during a December 5, 2007 investor meeting, Defendant Cassano described the collateral calls from counterparties as frivolous "drive by[s]."

43.    The foregoing statements were made at a time when AIG's controls over the valuation of the CDS portfolio "were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates on a timely basis." As subsequently revealed, minutes of AIG's audit committee memorialized the fact that there was a "lack of timely elevation of key data to the AIG level" and AIG "designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Accounting

function."

44. During its review of AIG's 2007 third quarter interim financial information, PwC was confronted with the following persuasive evidence that should have led PwC to conclude that there was a strong likelihood that AIG's financial statements as of and for the quarter ended September 30, 2007 were not in conformity with GAAP in all material (as discussed in SEC Staff Accounting Bulletin 99) respects:

a)   St. Denis, a former Assistant Chief Accountant in the Division of Enforcement of the SEC, resigned his position as AIGFP vice president of accounting policy because he had been intentionally excluded from the CDS valuation process;

b)   AIGFP's receipt of $3 billion in collateral calls from Goldman Sachs, which AIGFP disputed when it had no basis for doing so;

c)   AIGFP's receipt of collateral calls from other AIGFP counterparties;

d)   The fact that estimates made by AIGFP counterparties with respect to (i) the fair value of AIGFP super senior CDS's and (ii) the collateral required in connection with such instruments differed materially from AIGFP's estimates;

e)   AIG's "makeshift" Moody's valuation model, which used stale and irrelevant JP Morgan CDO tranche data, was ineffective for purposes of establishing valuations for the AIGFP super senior CDS portfolio;

f)   AIG's internal controls were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates on a timely basis;

g)   There was a lack of timely elevation of key data to the AIG level; and

h)   AIG designed a valuation process that did not allow the involvement of AIG's Corporate Enterprise Risk Management and AIG's Accounting function.

45.    With knowledge of these facts, PwC negligently failed to undertake those procedures necessary to investigate the impact of the foregoing on AIG's interim financial information as of, and for, the quarter ended September 30, 2007 in order to determine whether or not this information was in conformity with GAAP in all material respects.   Accordingly, PwC negligently permitted AIG to file interim financial statement in its Third Quarter 2007 10-Q that were materially misleading for the reasons discussed above and, in contravention of GAAP, failed to include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading.

46.    For example, GAAP (FASB Statement No. 5) requires disclosure of:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
> (a)    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or that a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> (b)    The amount of the loss can be reasonably estimated.
>
>        *       *       *
>
> If no accrual is made for a loss contingency because one or both of the conditions...are not met, or if an exposure to loss exists in excess of the amount accrued...disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

Despite these requirements, the financial statements in the Third Quarter 2007 10-Q failed to disclose AIG's $3 billion-plus collateral call contingency.

47.    Moreover, the financial statements in the Third Quarter 2007 10-Q lacked a key disclosure: the fact that "AIG did not have data to dispute Goldman's marks." *See* FCIC Report at p. 271; PWC FCIC 000111-13.

48.    PwC was required by SEC Rules (http://www.sec.gov/rules/final/34-42266.htm) to review the Third Quarter 2007 10-Q.  PwC, however, negligently failed to determine that it was materially misleading because the MD&A Section of the Third Quarter 2007 10-Q failed to disclose the collateral call contingency, the fact that AIG did not have data to dispute Goldman's marks, and the resultant and foreseeable adverse impact of these factors on AIG's liquidity. Accordingly, PwC negligently permitted dissemination of a materially misleading fiduciary communication.

49.    By late November, there was a consensus between PwC and AIG that the "makeshift" Moody's valuation model was inadequate for valuing the super-senior book, but there was no consensus on how that book should be valued.  PwC and AIG recognized that using Goldman's marks would result in a $5 billion valuation loss which would wipe out the quarter's profits.  *See* FCIC Report at p. 271.

50.    On November 29, 2007, Tim Ryan, Bob Sullivan, and H. Daubeney (PwC auditors) met with senior executives from AIG and the Financial Products subsidiary to discuss the situation.   According to notes of this meeting, "AIG reported that disagreements with Goldman continued, and AIG did not have data to dispute Goldman's marks."  *See* FCIC Report at p. 271; PWC FCIC 000111-13.  Moreover, at this meeting, Mr. Ryan announced that AIGFP had been "managing" the Super Senior valuation process (telling PwC that "PwC will not get any more information until after the [December 5, 2007] investor day presentation") and that PwC had "control concerns around risk management which could be a material weakness."  Mr. Ryan expressed PwC's concern that this weakness may have resulted in a material disclosure error and that it could result in an income statement and/or disclosure error in the future if it was not addressed.  Mr. Ryan further stated that PwC believed that Management's oversight of AIG

Investments was insufficient, due to lack of access and unclear delineation of roles, responsibilities, and management performance. *See* PWC FCIC 000111-13.

51.    James Bridgewater, the Financial Products executive vice president in charge of models, came up with a solution. He theorized that there was a calculable difference between the value of the underlying bonds and the value of the swap protection AIG had written on those bonds, and suggested using a "negative basis adjustment," to reduce the unrealized loss estimate from $5.1 billion (Goldman's figure) to about $1.5 billion. The adjustment was made with PwC's knowledge and, without any legitimate basis, AIGFP continued to dispute the legitimacy of Goldman Sachs' margin calls. *See* FCIC Report at p. 271.

52.    On February 6, 2008, Tim Ryan and Bob Sullivan (PwC auditors) met with Robert Willumstad, Chairman of AIG's Board of Directors. They informed him that the "negative basis adjustment" used to reach the $1.5 billion estimate disclosed on the December 5 investor call had been improper and unsupported, and was a sign that "controls over the AIG Financial Products super senior credit default swap portfolio valuation process and oversight thereof were not effective." PwC advised Mr. Willumstad that "this deficiency was a material weakness as of December 31, 2007." In other words, PwC would have to announce that the numbers AIG had already publicly reported were wrong. *See* FCIC Report at p. 273; PWC FCIC 000209-11.

53.    The following day, these PwC auditors (Tim Ryan and Bob Sullivan) met with the entire AIG Audit Committee and repeated what they had told Mr. Willumstad. *See* PWC-FCIC 000206-08.

54.    On February 11, 2008, AIG disclosed in a Form 8-K that its auditor had identified the material weakness noted above, acknowledging that it had increased its December valuation

loss estimates by $3.6 billion (that is, the difference between the estimates of $5.1 billion and $1.5 billion) because of the non-supportable negative basis adjustment. *See* FCIC Report at p. 273.

55.     This Form 8-K purported to expand AIG's prior disclosures "relating to the methodology and data inputs used to determine the fair values of the super senior credit default swap portfolio." This fiduciary communication disclosed the material internal control weakness while implying that AIG had cured deficiencies in its valuation methodology:

> As disclosed in AIG's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 (the "Form 10-Q"), AIGFP values its super senior credit default swaps using internal methodologies that utilize available market observable information and incorporate management estimates and judgments when information is not available. In doing so, it employs a modified Binomial Expansion Technique ("BET") model that currently utilizes, among other data inputs, market prices obtained from independent sources, from which it derives credit spreads for the securities constituting the collateral pools underlying the related CDOs. The modified BET model derives default probabilities and expected losses from market prices, not credit ratings. The initial implementation of the BET model did not adequately quantify, and thus did not give effect to, the benefit of certain structural mitigants, such as triggers that accelerate amortization of the more senior CDO tranches.
>
> As disclosed in the Form 10-Q, AIG did not give effect to these structural mitigants ("cash flow diversion features") in determining the fair value of AIGFP's super senior credit default swap portfolio for the three months ended September 30, 2007. Similarly, these features were not taken into account in the estimate of the decline in fair value of the super senior credit default swap portfolio through October 31, 2007 that was also included in the Form 10-Q because AIG was not able to reliably estimate the value of these features at that time. Subsequent to the filing of the Form 10-Q, through development and use of a second implementation of the BET model using Monte Carlo simulation, AIGFP was able to reliably estimate the value of these features. Therefore, AIG gave effect to the benefit of these features in determining the cumulative decline in the fair value of AIGFP's super senior credit default swap portfolio for the period from September 30, 2007 to November 30, 2007 that was disclosed in AIG's Current Report on Form 8-K/A, dated December 5, 2007 (the "Form 8-K/A") filed after AIG's December 5, 2007 Investor Conference.

In addition, during AIG's December 5 Investor Conference, representatives of AIGFP indicated that the estimate of the decline in fair value of AIGFP's super senior credit default swap portfolio during November was then being determined on the basis of cash bond prices for securities in the underlying collateral pools, with valuation adjustments made not only for the cash flow diversion features referred to above but also for "negative basis", to reflect the amount attributable to the difference (the "spread differential") between spreads implied from cash CDO prices and credit spreads implied from the pricing of credit default swaps on the CDOs.

56.     AIG's dissemination of its February 11, 2008 Form 8-K had an immediate adverse impact.  According to a February 11, 2008 *Fortune* article ("AIG's bad accounting day"), "AIG's unexpected announcement today about 'material accounting weakness' in part of its portfolio has sent its stock careening down 11 percent in mid-day trading."  The article noted that "the stock dropped to $44.82, a drop of $5.86.  *Bloomberg* reported it was AIG's biggest one-day decline in 20 years."

57.     In addition, as memorialized in a February 14, 2008 article in the *Insurance Journal*, the Company's filing on Form 8-K caused *A.M. Best* to place AIG's ratings under review with negative implications:

> A.M. Best Co. has placed the financial strength rating (FSR) of A++ (Superior) and issuer credit ratings (ICR) of "aa+" of the domestic life and retirement services subsidiaries of American International Group (AIG) under review with negative implications.
>
> In addition, A.M. Best has placed the FSRs of A+ (Superior) and ICRs of "aa-" of most of AIG's domestic property/casualty subsidiaries and AIG's 60 percent majority owned company, Transatlantic Holdings, Inc. under review with negative implications. The FSRs and ICRs of these rating groups incorporate implicit support from AIG.
>
> Concurrently, A.M. Best has placed the ICR of "aa" under review with negative implications for American International Group, Inc. A.M. Best also has placed all the debt ratings of Transatlantic Holdings, Inc. and 21st Century Insurance Group under review with negative implications. The FSR of A++ (Superior) and ICR of "aa+" of the Hartford Steam Boiler Group (Connecticut) remain unaffected as the group has met the criteria for A.M. Best's highest rating category on a stand-alone basis.

A.M. Best said these rating actions follow AIG's Feb. 11, 2008, SEC Form 8-K filing clarifying its methodology in determining the fair value of the super senior credit default swap portfolio with respect to the multi-sector collateralized debt obligations (CDOs) of AIG Financial Products Corp. (AIGFP).   The disclosures revealed that further refinements of data used in its internal models resulted in a significantly higher decline in valuation through Nov. 30, 2007.

AIG further disclosed that due to current difficult market conditions, the material benefit of spread differentials incorporated through November 2007 are not quantifiable and will not benefit portfolio valuation at December 31, 2007.   Therefore, AIG will reflect a sizable fair vale decline. The fair value losses associated with declines in valuations of this particular swap portfolio do not necessarily reflect permanent economic losses but a change in the fair value assessments of the underlying collateral, which includes a mix of approximately 50 percent subprime mortgages as well as asset backed auto loans, credit cards and other collateral, according to A.M. Best, which added that it believes it is likely that true economic losses will not reach the level of fair value accounting adjustments.

Additionally, AIG's model development over the past several months and refinement of data inputs and sources has caused revisions of the insurer's fair value determination.  The necessity of the model improvements, which continued into 2008, contributed to its independent auditors conclusion that at Dec. 31, 2007, AIG had a material weakness in its internal control and oversight relating to the fair valuation of AIGFP's super senior credit default swap portfolio. A.M. Best said that it "understands that the fair value valuation is exceptionally difficult given market conditions; however, the decline in valuation, negative earnings implications and accounting conclusions are representative of the risk inherent in this business." The implied support incorporated into the operating subsidiary ratings will need to be re-evaluated in light of the financial volatility caused by AIG's derivatives business, A.M. Best said.   In addition, uncertainty remains in AIG's investment portfolio valuations, and to a lesser extent, results of its mortgage insurance and consumer finance businesses. Given the uncertainty in market conditions and continued potential re-estimation of the value of the swap portfolio in the near term, A.M. Best said it needs more time to re-evaluate implied support. A.M. Best said that the support incorporated into the subsidiaries' rating also relies on AIG's financial flexibility, which A.M. Best said it continues to believe is significant.  However, the ratings firm added that "that flexibility has been modestly compromised by a decline in stock value, higher financial leverage and tightened credit markets." A.M. Best reported that its concerns are tempered by the "strong franchise value and sustainable competitive advantages of AIG's property/casualty and life and retirement services operating segments, ability to generate significant earnings, overall diversification and considerable intellectual capital." A.M. Best said it will re-evaluate the company's status

after seeing the 2007 year-end results and discussions with AIG management.

58.    In mid-February, *MarketWatch* reported that Moody's also placed AIG on a negative outlook.

59.    On February 28, 2008, AIG filed its 2007 Form 10-K with the SEC. It contained disclosures that were substantially identical to the ones appearing in the February 11, 2008 Form 8-K.

60.    GAAS required PwC to review AIG's 2007 Form 10-K, which included numerous statements that demonstrated an awareness of AIG's liquidity risks:

> AIG's liquidity could be impaired by an inability to access the capital markets or by unforeseen significant outflows of cash. This situation may arise due to circumstances that AIG may be unable to control...In addition, this situation may arise due to circumstances specific to AIG, such as a decline in its credit ratings. *See* 2007 Form 10-K at p. 15.

> *            *            *

> AIG's liquidity may be adversely affected by requirements to post collateral. Certain of the credit default swaps written by AIGFP contain collateral posting requirements. *See id.* at p. 16.]

> *            *            *

> If AIGFP sells or closes out its derivative transactions prior to maturity, the effect could be significant to AIG's overall liquidity. *See id.* at p. 16.

> *            *            *

> The current disruption in the credit markets has affected the liquidity of other AIG portfolios including the residential mortgage-backed securities portfolio. If AIG requires significant amounts of cash on short notice in excess of normal cash requirements or is required to post or return collateral in connection with its investment portfolio, derivative transactions or securities lending activities, then AIG may have difficulty selling these investments or terminating these transactions in a timely manner or may be forced to sell or terminate them for less than what AIG might otherwise have been able to, or both. *See id.* at p. 16.

> *            *            *

Certain OTC derivatives trade in less liquid markets with limited pricing information, and the determination of fair value for these derivatives is inherently more difficult. *See id.* at p. 38.

*       *       *

The change in fair value of AIGFP's credit default swaps . . . were caused by the significant widening in spreads in the fourth quarter on asset-backed securities, principally those related to U.S. residential mortgages, the severe liquidity crisis affecting the structured finance markets and the effects of rating agency downgrades on those securities. *See id.* at p. 82.

61.     Upon AIG's filing of its 2007 Form 10-K, Keefe Bruyette downgraded AIG from "Outperform" to "Market Perform" due to concerns about the Company's deteriorating profit trends.

62.     On February 28, 2008, PwC issued its report on AIG's consolidated financial statements as of and for the fiscal year ended December 31, 2007. This report stated:

To the Board of Directors and Shareholders of American International Group, Inc.:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of American International Group, Inc. and its subsidiaries (AIG) at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. We

considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2007 consolidated financial statements, and our opinion regarding the effectiveness of AIG's internal control over financial reporting does not affect our opinion on those consolidated financial statements. AIG's management is responsible for these financial statements and financial statement schedules, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in management's report referred to above. Our responsibility is to express opinions on these financial statements, on the financial statement schedules, and on AIG's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.  Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Note 1 to the consolidated financial statements, as of January 1, 2007, AIG changed the manner in which it accounts for internal replacements of certain insurance and investment contracts, uncertainty in income taxes, and changes or projected changes in the timing of cash flows relating to income taxes generated by leveraged lease transactions.

As described in Notes 1 and 17 to the consolidated financial statements, AIG changed its accounting for certain hybrid financial instruments, life settlement contracts and share based compensation as of January 1, 2006, and certain employee benefit plans as of December 31, 2006.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of

the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.     Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

63.     PwC was negligent in opining that AIG's financial statements as of, and for the year ended, December 31, 2007 were presented fairly in conformity with GAAP, because PwC could not assess the appropriateness of AIG's asset valuations.  As admitted by AIG (AIG-SEC1364133-40 - "Status Of Collateral Call Postings as of December 31, 2007"), "[t]he market is so illiquid that there are no willing takers of risk currently so valuations are simply best guesses and there is no two way market in any sense of the term."  Accordingly, PwC was required to issue a qualified audit opinion (AU 508).   PwC, however, negligently failed to do so.

64.     Issuance of a qualified opinion would have served to put the investing public and Plan participants on notice that there was no market for a material portion of AIG's assets and that, accordingly, AIG's financial statements were materially impacted by what were little more than questionable valuation guesses.

65.     PwC was also negligent in issuing its February 28, 2008 report because PwC negligently ignored the fact that, particularly in view of the foregoing, PwC had a responsibility:

to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited (hereinafter referred to as a reasonable period of time).   The auditor's evaluation is based on his knowledge of relevant conditions and events that exist at or have occurred prior to the completion of fieldwork. Information about

- 25 -

such conditions or events is obtained from the application of auditing procedures planned and performed to achieve audit objectives that are related to management's assertions embodied in the financial statements being audited, as described in section 326, Evidential Matter. *See* AU 341.

66.     PwC either negligently failed to evaluate whether there was substantial doubt about AIG's ability to continue as a going concern, or was negligent in the performance of this evaluation.  In either case, PwC negligently failed to append a "going concern" paragraph to its opinion, which would have served to put the investing public and Plan participants on notice that AIG was facing a severe liquidity crisis that threatened the survival of the Company.  In this regard, PwC failed to recognize the imminent adverse impact on AIG's liquidity arising from the fact that:

a)      AIG had insured tens of billions of dollars of real estate related debt pursuant to arrangements that would require AIG to post tens of billions of collateral in the event of a continued downturn in the U.S. real estate market;

b)      The U.S. real estate market was experiencing a severe downturn and counterparties were demanding that AIG post billions of dollars of collateral;

c)      AIG had no reserves established for the posting of collateral, and no borrowing capability sufficient to cover the billions of dollars of additional likely near term collateral calls;

d)      There was no market for a material portion of AIG's assets and, therefore, no way to raise cash sufficient to cover the billions of dollars of likely near term collateral calls.

e)      AIG's woefully deficient internal controls and unreliable accounting methodologies obscured AIG's precarious liquidity position;

f)      Dissemination of the 2007 Form 10-K, which disclosed collateral call disputes involving significant differences between the counterparties, was virtually certain to

result in Analyst downgrades, which would cause collateral calls to increase.

67.     During its negligent audit of AIG's financial statements as of, and for the year ending, December 31, 2007, PwC made judgments that deviated from the standard of care expected of an auditor under the circumstances then present and arrived at a conclusion that an unqualified opinion was appropriate when this conclusion was not supported by the facts.

68.     The negligently issued PwC February 28, 2008 report, insofar as it contained an opinion which stated that PwC's audit of the Company's financial statements were conducted in accordance with GAAS, was false and misleading because the following GAAS (AU 150) provisions were negligently violated:

a)      General Standard No. 1 was violated, which standard requires that the examination is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

b)      General Standard No. 3 was violated, which standard requires that due professional care is to be exercised in the performance of the examination and in the preparation of the report;

c)      Standard Of Field Work No. 1 was violated, which standard requires that the work is to be adequately planned and assistants, if any, are to be properly supervised;

d)      Standard Of Field Work No. 2 was violated, which standard requires that a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed;

e)      Standard Of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination;

f)      Standard Of Reporting No. 1 was violated, which standard requires that the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles; and

g)      Standard Of Reporting No. 3 was violated, which standard requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

69.    AIG was required to disclose in its 2007 Form 10-K that it was unable to value a material portion of its assets and the existence of a going concern uncertainty. AIG, however, failed to make such disclosures and PwC was, therefore, required pursuant to GAAS to inform the investing public of these facts by issuance of an appropriately modified auditor's report.

70.    PwC negligently violated GAAS in failing to modify its February 28, 2008 report to express a qualified opinion with an explanatory "going concern" paragraph explaining the nature and extent of AIG's liquidity problems.

71.    GAAS states that the auditor should exercise (a) due care in planning, performing, and evaluating the results of audit procedures, and (b) the proper degree of professional skepticism to achieve reasonable assurance that material errors or irregularities will be detected.

72.    PwC failed to comply with GAAS in that it negligently failed to perform its examinations with a proper degree of professional skepticism.  In this regard, PwC either identified and negligently ignored, or negligently failed to identify, evidence that AIG was incapable of valuing a material potion of its assets; that AIG was incapable of legitimately disputing collateral calls; and that AIG was facing a severe liquidity crisis.  Accordingly, in issuing its unqualified February 28, 2008 opinion, PwC made audit judgments that deviated from the standard of care expected of an auditor confronted with the same facts.

73.    PwC violated the provisions of GAAS which provides that the auditor should obtain a level of knowledge of the entity's business that will enable the auditor to plan and perform the audit in accordance with GAAS because that knowledge of the entity's business helps the auditor in:

a)    Identifying areas that may need special consideration;

b)    Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization;

c)    Evaluating the reasonableness of management representations; and

d)    Making judgments about the adequacy of disclosures.

74.    Had PwC undertaken the performance of those audit procedures which were required by GAAS, and with the due professional care which was required by GAAS, PwC should have known that, given (i) AIG's woefully deficient internal controls; (ii) AIG's inability value a material portion of its assets; (iii) the absence of a market for a material portion of its assets; (iv) AIG's material CDS obligations (v) AIG's credit rating; (vi) the mushrooming collateral calls; and (vii) the state of the economy and the real estate environment as of February 28, 2008, AIG had insufficient liquidity to continue as a going concern through the end of 2008. In negligent disregard of professional standards, PwC failed to disclose this fact to the investing public (including Plan participants) as required by GAAS.

75.    GAAS states that: "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." PwC negligently failed to comply with this GAAS mandate.  Indeed, as memorialized by AIG (AIG-SEC1364133-40 -- "Status Of Collateral Call Postings as of December 31, 2007"), "[a]ll offline dealers feel that as the market is under extreme stress that prices should perhaps be lower but none have any real idea as to how best to calculate that price or if indeed that statement is true. The market is so illiquid that there are no willing takers of risk currently so valuations are simply best guesses and there is no two way market in any sense of the term."

76.    On September 17, 2008, the U.S. Government provided $85 billion to AIG to prevent its bankruptcy.

77.    Plaintiff and Plan participants sustained inordinate losses due to their reliance upon the negligently issued February 28, 2008 PwC report specified above.

## DISCLOSURE OF PWC'S NEGLIGENTLY CONDUCTED AUDITS

78.     On April 7, 2010, the blog *re: The Auditors* posted an article entitled "Good News. Bad News. AIG's Cassano Snitches on PwC." In that blog, Francine McKenna wrote:

> *"I believe that PwC was aware of weaknesses in internal controls over the AIGFP super senior credit default portfolio throughout 2007 and prior."*

Why did I say that back in February? Because of this excerpt:

> *"Mr. Bensinger [AIG CFO] then indicated that he, Mr. Sullivan [AIG CEO] and Messrs. Ryan and Nally had been meeting regularly to discuss the control matters . . . . Mr. Ryan commented that following the third quarter close, the PwC team debriefed and assessed a number of issues that had occurred, such as the securities lending program and the operation of AGF, Inc., the* **AIG Financial Products Corp super senior credit default swap portfolio** *and disclosure issues in the presentation of maximum exposures of UGC. . . ."*

PwC is cooperating not only with plaintiff's attorneys in the suits against AIG but with the Department of Justice. However, this particular "voluntary" disclosure by PwC makes them look bad and tells me AIG executives lied. Take a look at this story from May of 2008:

Pricewaterhouse's Squeeze Play AIG Says It Misled Auditor, As Greenberg Cites Review Clearing Internal Controls

*American International Group Inc.'s lengthened laundry list of accounting woes shines the spotlight more brightly on the role played by its outside auditor, PricewaterhouseCoopers LLP. . . . The insurer's latest release* **offered some relief for the accounting firm***: It noted that "in certain instances," improperly booked transactions "may also have involved misrepresentations to management, regulators* **and AIG's independent auditors." . . .** *Pricewaterhouse wasn't told in full about AIG's ties to or dealings with two offshore reinsurance companies that AIG, because of the internal reviews, now plans to consolidate into its financial statements . . . . AIG also acknowledged that former executives at times had been able to "circumvent internal controls over financial reporting."*

If Cassano did tell PwC all about the Financial Products Group activities, and AIG told PwC about all of their control issues throughout 2007 and prior, what are the legal implications for PwC? PwC knew about and blessed AIG's subterfuges until they couldn't – the "negative basis adjustment" was an accounting trick.

AIG publicly said PwC had been duped.  Now PwC is giving up workpapers and private notes that say they weren't duped, *without a legal fight?*

What else does PwC have on AIG?

Or AIG on PwC?

Joe Cassano is no longer playing this game.

Isn't it time, finally, for regulators to force PwC to resign as AIG auditor?  They have no independence or objectivity when it comes to "client" AIG.

79.     On June 30, 2010, the blog *re: The Auditors* posted an article entitled "What a Tangled Web We Weave: AIG's Cassano Says He Told PwC Everything."   That article, reporting on Cassano's testimony before the FCIC, stated:

> Joseph Cassano, the former head of AIG's Financial Products Group, testifies today for the Financial Crisis Inquiry Commission, a bipartisan commission with a critical non-partisan mission — to examine the causes of the financial crisis.
>
> *          *          *
>
> The Department of Justice cleared Mr. Cassano in May. No criminal charges will be filed. U.K.'s Serious Fraud Office dropped probes last month, and the U.S. Securities and Exchange Commission also closed their investigations too.  Mr. Cassano was villainized by the press and his own former company for not keeping anyone informed of the potential losses on his portfolio and making misleading statements to investors including the auditors, PricewaterhouseCoopers.
>
> But the investigations went aground when, *"prosecutors found evidence Mr. Cassano did make key disclosures.  They obtained notes written by a PwC auditor suggesting Mr. Cassano informed the auditor and senior AIG executives about the adjustment . . . [and] told AIG shareholders in November 2007 that AIG would have "more mark downs," meaning it would lower the value of its swaps."*
>
> So who's telling the truth?  Was PwC duped by AIG?  Who is looking out for AIG shareholders and now, the US taxpayer in this mess?
>
> *          *          *
>
> Cassano says he told the auditors everything.  Unfortunately for AIG and PwC, that excuse is contradicted by AIG's statements during an earlier, similar crisis in disclosures and accounting.  Why

- 31 -

didn't the Department of Justice and the SEC see this pattern of cover-up between AIG management and its auditors and the lack of independence of the auditors, PwC?

          *       *       *

PricewaterhouseCoopers has been playing consigliere to AIG for many, many years and continues to be allowed to act as their "independent" auditor in spite of the fact that they have been sued by AIG's shareholders and are now turning their own partners against their client in court.

If PwC was informed about Cassano's activities, then perhaps the SEC, the PCAOB and Department of Justice should finally turn their attention towards the audit firm. Maybe they can take a look at how they played their two clients, AIG and Goldman Sachs, against each other regarding the valuation of the same set of assets?

Why would either AIG or Goldman Sachs keep a firm like PwC around, one that adds no value, provides no guidance other than a nod of the head and turns on you to save their own skin when expedient? Well, it may be a prime example of the old adage, *"Keep your friends close and your enemies closer."* PwC knows where the bodies are buried and PwC has been willing to go along with the program all these years. It's a pain in the neck to train a new auditor.

What's in it for PwC? $205 million in fees from AIG in 2009, an increase of 43% from 2008. PwC earned $107 million from Goldman Sachs in 2009, an increase of 7% from 2008.

That sounds like $312 million reasons for PwC to go along with the charade of independence.

80.       As alleged above, on July 19, 2010, Plaintiff made a demand on the AIG Investment Committee to take action against PwC to recover losses to the Plan caused by PwC's negligently conducted audits of AIG. *See* Exhibit A attached hereto. The Demand was referred to AIG's Retirement Board – the Plan fiduciaries – which refused the Demand on September 13, 2010. *See* Exhibit B attached hereto.

## INJURY TO THE PLAN

81.     As a consequence of PwC's negligently conducted review and audit, as specified above, the Plan suffered substantial losses, resulting in the depletion of millions of dollars from the retirement savings and anticipated retirement income of the Plan's participants.

82.     PwC knew that the AIG SEC filings containing the reviewed and audited financial statements were incorporated by reference in fiduciary communications to Plan participants and, therefore, would be, and were, relied upon by the Plan participants because from 2007 through 2008, PwC also provided audit services to the Plan.  As the auditor of the Plan, PwC knew that AIG's periodic SEC filings containing audited financial statements were incorporated by reference into the Plan and, therefore, relied upon by the Plan participants.  Accordingly, PwC knew that AIG's above specified financial statements, which were included in AIG's publicly filed documents during the Relevant Period, would be, and were, relied upon by the Plan participants.

## BREACH OF FIDUCIARY DUTIES ALLEGATIONS

83.     Plaintiff brings this action against the Retirement Board under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  Section 502(a)(2), 29 U.S.C. § 1132(a)(2), states that "[a] civil action may be brought -- " "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"  ERISA Section 409(a), 29 U.S.C. § 1109(a), states that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary*, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

84.    As noted above, the Retirement Board owes the Plan the fiduciary duty to preserve and maintain all the Plan assets, including the duty to enforce valid claims held by the Plan.

85.    Despite its fiduciary duty to do so, the Retirement Board failed to undertake any action to recover losses to the Plan caused by PwC's negligence in performing its audits of AIG during the Relevant Period.

86.    On July 19, 2010, Plaintiff made a demand on the Retirement Board to initiate an action against PwC.  *See* Exhibit A attached hereto.  On September 13, 2010, the Retirement Board responded by refusing Plaintiff's Demand (Retirement Board Response attached hereto as Exhibit B), and has failed to take any action as of the date of the filing of this Complaint.

87.    The Retirement Board's refusal of Plaintiff's Demand and failure to act against PwC constitutes a breach of the fiduciary duties they owe to preserve and maintain all the Plan assets.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY TO PRESERVE AND MAINTAIN PLAN ASSETS
### (Claim Against the Retirement Board)

88.    Plaintiff incorporates by reference paragraphs 21 through 87 as if fully set forth herein.

89.    The Retirement Board owes the Plan, its participants, and beneficiaries the fiduciary duty to preserve and maintain the Plan assets.  This duty includes enforcing valid claims held by the Plan.

90.    Despite the fact that Plaintiff issued the Demand, demanding that the Retirement Board (the Plan fiduciaries) take action to pursue claims on behalf of the Plan against PwC based

on PwC's negligent audit of AIG during the Relevant Period, the Retirement Board has wrongfully refused that demand.

91.     The Retirement Board's failure to take any action whatsoever to enforce the Plan's valid claim against PwC for professional malpractice in connection with PwC's audit of AIG's financial statements during the Relevant Period, constitutes a breach of the fiduciary duties that the Retirement Board owes to the Plan.  As a consequence of this breach, the Plan suffered losses.

92.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

## SECOND CAUSE OF ACTION

### PROFESSIONAL MALPRACTICE

**(Trust Beneficiaries' Derivative Claim under New York Law on Behalf of the Plan Against Defendant PwC)**

93.     Plaintiff incorporates by reference paragraphs 21 through 87 of this Complaint as if fully set forth herein.

94.     Plaintiff, as a participant in the Plan, is a beneficiary of a trust under New York law who may derivatively seek relief on behalf of the Plan against PwC because the Retirement Board refused to act upon Plaintiff's demand that the Plan fiduciaries seek such relief on behalf of the Plan.

95.     Plaintiff made a written demand upon the Plan fiduciaries to take action against PwC for the losses to the Plan caused by PwC's negligent review and audit of AIG's financial

statements during the Relevant Period, but the Retirement Board wrongfully refused that demand.

96.     Defendant PwC owed a duty of care to AIG to exercise that degree of skill normally expected of accountants performing auditing services for public companies.   In performing audits for AIG during the Relevant Period, however, PwC failed to exercise the degree of care, skill, and competence exercised by competent members of the accounting profession as alleged above.

97.     Further, due to the fact that PwC served as auditor of the Plan from 2007 through 2008, it knew that the audited financial statements included in the AIG public filings during the Relevant Period would be incorporated into the Plan and, therefore, would be and were relied upon by participants and beneficiaries of the Plan.

98.     The Plan has suffered actual damages as a result of being funded with AIG Stock.

99.     Defendant PwC is liable for all losses to the Plan as a result of the afore-described violations of its professional duties and negligence.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.     An Order compelling Defendant PwC to make good to the Plan all losses resulting from Defendant PwC's negligence and professional malpractice in the audits of AIG during the Relevant Period, and to restore to the Plan all profits which the participants would have made if PwC had fulfilled its professional obligations in conducting those audits;

B.     Imposition of a Constructive Trust on any amounts by which Defendant PwC was unjustly enriched at the expense of the Plan as the result of its negligence;

C.     Actual damages in the amount of any losses the Plan suffered as a consequence of the Retirement Board's breaches of its fiduciary duties in failing to initiate action

against PwC in order to enforce valid claims by the Plan against PwC based upon PwC's negligent audit of AIG during the Relevant Period;

        D.      An Order awarding attorney' fees; and

        E.      An Order for equitable restitution and other appropriate equitable relief against Defendant PwC.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 20, 2011

*EGLESTON LAW FIRM*

By: _____
    Gregory M. Egleston
    360 Furman Street, Suite 443
    Brooklyn, NY 11201
    Telephone: (646) 227-1700
    Facsimile: (646) 227-1701
    Email: egleston@gme-law.com
            greg.egleston@gmail.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Telephone (516) 683-3516
Email: sdr@rigrodskylong.com
Email: tjm@rigrodskylong.com

-and-

Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rigrodskylong.com

*Attorneys for Plaintiff*

EXHIBIT A

*Egleston Law Firm*

360 Furman Street
Suite 443
Brooklyn, NY 11201
Email: greg.egleston@gmail.com
Email: egleston@gme-law.com
Website: www.gme-law.com

Tel: (646) 227-1700

Fax: (646) 227-1701

July 19, 2010

**Via Overnight FedEx**

Mr. David Junius
American International Group, Inc.
AIG Investment Committee
70 Pine Street
New York, New York 10270

Re:   The American International Group, Inc. Incentive Savings Plan

Dear Mr. Junius:

We are counsel for Wanda Mimms (a former American International Group, Inc. ("AIG" or the "Company") employee and, at all relevant times, a participant in the American International Group, Inc. Incentive Savings Plan (the "Plan"). This letter is being transmitted to you to demand that the AIG Investment Committee (the "Committee") prosecute, on behalf of the Plan, the malpractice and/or negligence claims that are set forth below against PricewaterhouseCoopers ("PwC") and/or direct the Trustee of the Plan or other responsible entity or person to prosecute these claims.

PwC served as the purportedly independent auditor of AIG during the period of February 28, 2008 through the present. PwC's audited AIG's fiscal 2007 financial statements and incorrectly represented that it conducted its audit in accordance with generally accepted auditing standards ("GAAS"). PwC breached its professional duties to the Plan, and/or was negligent in performing its duties, because PwC failed to recognize that: (a) AIG had insured tens of billions of dollars of real estate related debt pursuant to arrangements that required AIG to post tens of billions of collateral in the event of a severe downturn in the U.S. real estate market; (b) the U.S. real estate market was experiencing a severe downturn and counter-parties were demanding that AIG post billions of dollars of collateral; (c) AIG had no reserves established for the posting of collateral, and no borrowing capability sufficient to cover the billions of dollars of likely near term collateral calls; (d) AIG's statement in its 2007 form 10-K that "[m]anagement believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, including the funding of increased dividends under AIG's new dividend policy" was

*Mr. David Junius*
*July 19, 2010*
*Page 2*

unsupportable; (e) AIG's woefully deficient internal controls and unreliable accounting methodologies were permitted to exist at AIG in order to obscure AIG's precarious liquidity position; and (f) given the facts and circumstance that existed as of the February 28, 2008 date of PwC's report, AIG was unlikely to be able to continue as a going concern throughout 2008. As a result of PwC's professional malpractice and/or negligence, the Plan suffered substantial losses.

For the foregoing reasons, we hereby make a formal demand upon the Committee, in its capacity as fiduciary of the Plan, to prosecute professional malpractice and/or negligence claims against PwC to recover the Plan assets. The purpose of this demand letter is to give the Committee the opportunity to institute claims on behalf of Plan. If you fail to respond or contact us within thirty (30) days of the date of this letter, we will assume that you have refused this demand and we, derivatively on behalf of the Plan, will then institute an action to obtain the remedies we are asking you to obtain herein.

We look forward to hearing from the Committee regarding this matter.

Very truly yours,

Gregory M. Egleston

-and -

Thomas J. McKenna
Gainey & McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017

EXHIBIT B

Lee A. Trucker
R. Bradford Huss
Charles A. Storke
Benjamin F. Spater
Deborah Judith Wiener
Julie Burbank
Ronald J. Triche
Mary E. Powell
Robert F. Schwartz
Tiffany N. Santos
Kevin E. Nolt
Clarissa A. Kang

Elizabeth L. Loh
Matthew L. Gouaux
Michelle L. Schuller
Virginia H. Perkins
Jennifer Dack Brooks
J. Marc Fosse
Jennifer B. Chung
Brian C. Gilmore
Robert R. Gower

Of Counsel
Barbara B. Creed

Special Counsel
Barbara P. Pletcher
Richard A. Gilbert



**TRUCKER ♦ HUSS**

A PROFESSIONAL CORPORATION
ERISA AND EMPLOYEE BENEFITS ATTORNEYS

September 13, 2010

**VIA FEDERAL EXPRESS**

Gregory M. Egleston
Egleston Law Firm
360 Furman Street
Suite 443
Brooklyn, New York 11201

Writer's Direct Dial
415 2⁷⁷ ;80⁷

Re:   *The American International Group, Inc. Incentive Savings Plan*

Dear Mr. Egleston:

We write on behalf of the AIG Retirement Board (the "Board") in response to your July 19, 2010 letter to Mr. David Junis, a member of the American International Group, Inc. ("AIG") Investment Committee. Your letter was sent on behalf of Wanda Mimms, a participant in the AIG Incentive Savings Plan (the "Plan"). In that letter, you demand that the fiduciaries of the Plan prosecute claims of professional negligence and/or professional malpractice against PricewaterhouseCoopers ("PwC") on behalf of the Plan. You also set out the ways in which you assert that PwC breached its duties and state that the Plan suffered substantial losses as a result of PwC's alleged breaches. As indicated in Richard A. Grosiak's August 11, 2010 letter to you, your demand was referred to the Board, the named fiduciary of the Plan, for consideration at the Board's next regularly scheduled meeting.

The Board held a meeting on August 24, 2010 at which the demand outlined in your July 19, 2010 letter was considered. Prior to that meeting, the Board retained our law firm, Trucker Huss, as independent outside fiduciary counsel to assist in considering the demand. We reviewed your demand and analyzed the factual background and relevant legal principles relating to your assertion that the Plan had professional negligence and/or professional malpractice claims against PwC. I attended the Board meeting and presented our analysis to the Board and answered their questions. I also reviewed with the Board the fiduciary responsibility rules applicable to them under ERISA.

In its deliberations, the Board considered the legal viability of any professional negligence and professional malpractice claims that the Plan might be able to assert against PwC, the Plan's likelihood of success on those claims and the potential costs to the Plan of pursuing those claims in litigation, as the costs of bringing any such claims against PwC would be paid from Plan assets and borne by the Plan participants. The Board reviewed the points described in your letter and the factual background of the matter as well as relevant legal authorities concerning malpractice claims against accountants.

#1106891

100 Montgomery Street, 23rd Floor, San Francisco, California 94104-4355
Tel (415) 788-3111 ♦ Fax (415) 421-2017 ♦ www.truckerhuss.com

Gregory M. Egleston
September 13, 2010
Page 2

The claims alleged in your letter relate to PwC's audit of AIG's 2007 fiscal year financial statements. The Board carefully considered the strength of any potential professional negligence and professional malpractice claims by the Plan based on PwC's audit of AIG's 2007 financial statements, both as direct claims and as derivative claims. Among other facts, the Board noted that the Plan was not in contractual privity with PwC as to its audit of AIG's 2007 fiscal year financial statements and that there has been no restatement by AIG of its financial statements for the 2007 fiscal year. The Board considered the controlling law and the factual underpinnings necessary to state such claims by the Plan against PwC and assessed that such claims would have little chance of success and could potentially be very expensive for the Plan to litigate.

The Board also took into consideration the fact that PwC is currently a defendant in *In re American International Group, Inc. 2008 Securities Litigation*, S.D.N.Y., Case No. 1:08-cv-04772 (the "Securities Litigation"), a securities action currently pending in federal court. The plaintiffs in that lawsuit allege that PwC violated Section 11 of the Securities Act of 1933, based on allegations of fact similar to those outlined in your letter. The Plan is a member of the putative plaintiff class in the Securities Litigation and should receive part of any recovery if the Securities Litigation against PwC is successful or results in a settlement. The Board determined that a malpractice action against PwC by the Plan in state court attempting to recover losses to the Plan based on the same underlying facts as Securities Litigation would be largely duplicative, as well as unlikely to succeed.

For the reasons described herein and other reasons discussed and considered at the Board's August 24, 2010 meeting, and after careful and thorough deliberation, the Board determined, based on the facts currently known to the Board, that expending Plan assets to bring the claims against PwC alleged in your July 19, 2010 letter would not be in the best interests of the Plan and its participants. Therefore, the Board does not intend to commence litigation against PwC as demanded in your July 19, 2010 letter. Your letter also states that, if the Plan fiduciaries do not prosecute the claims you allege against PwC, you will institute an action against PwC "derivatively on behalf of the Plan." We are unaware of any basis for Ms Mimms, as a Plan participant, to assert state law claims against a third party on behalf of the Plan.

Please direct any further correspondence on this matter to me at the address above.

Very truly yours,

R. Bradford Huss

RBH:ss

cc:     AIG Retirement Board

#1106891

## VERIFICATION

I, WANDA MIMMS, hereby verify that I have reviewed the foregoing Amended Verified Complaint and have authorized its filing. The allegations contained therein as to myself are true and correct, and the other allegations are true and correct to the best of my knowledge, information and belief.

Date: April 15, 2011

WANDA MIMMS